UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-CV-387 (JEL/JGL)

Carolina Casualty Insurance Co.,

Plaintiff,

v.

ORDER

Alfred Burbach, Armstrong Rigging and Erecting, Inc., and Continental Insurance Co.,

Defendants.

---

Mark A. Gwin, Esq., appeared for Plaintiff Carolina Casualty Insurance Company.

John L. Tambornino, Esq., appeared for Defendant Alfred Burbach.

Sally J. Ferguson, Esq., appeared for Defendant Armstrong Rigging and Erecting, Inc.

Stephen O. Plunkett, Esq., appeared for Defendant Continental Insurance Company.

---

THIS MATTER came before the undersigned Judge of the District Court on July 29, 2002, for a hearing on cross-motions for summary judgment. Carolina Casualty Insurance Company, Continental Insurance Company, and Alfred Burbach have all filed Motions for Summary Judgment. For the reasons discussed below, the Court denies Continental Insurance Company's motion, and grants in part and denies in part the motions of Carolina Casualty Insurance Company and Alfred Burbach.

1. Factual Background

The Defendant, Alfred Burbach ("Burbach"), was injured while working for Marquardt Transportation Company ("Marquardt"), which had been hired by another company, Portec, to move Portec's freight from Minneapolis to South Dakota. Portec hired Defendant, Armstrong Rigging and Erecting, Inc. ("Armstrong"), to load its freight onto Marquardt's trailers. On March 17, 1987, Burbach, who was supposed to transport the freight to South Dakota, noticed that Armstrong's employees had not properly secured part of the freight they had loaded. Without



SEP 13 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED SEP 13 2002
DEPUTY CLERK'S INITIALS

seeking assistance, Burbach attempted to reposition part of the load, a cabinet weighing between 600 and 900 pounds. The cabinet tipped over and fell across Burbach's legs, permanently injuring him. Marquardt's insurance provider was Plaintiff, Carolina Casualty Insurance, Co. ("Carolina"); Armstrong's insurance provider was Defendant, Continental Insurance Company ("Continental").

2. <u>Procedural Background</u>

On August 7, 1991, Burbach commenced a lawsuit against Armstrong in the United States District Court for the District of Minnesota under Court File Number 4-91-CV-593. Armstrong tendered defense of the lawsuit to both Continental and Carolina. Carolina denied that Armstrong was covered under Marquardt's policy and that it had a duty to defend Armstrong. Continental accepted the tender of defense but maintained that Carolina provided the only applicable insurance coverage for Burbach's claims. Continental argued that Armstrong was a "permissive user" of Marquardt's trailers, making it an "omnibus insured" under Marquardt's policy with Carolina. The parties attempted to enter into a *Miller-Shugart*[1] Settlement whereby: Burbach released Armstrong and Continental from liability; Armstrong assigned to Burbach its rights to recover from Carolina; Armstrong stipulated to a judgment against it in the amount of $825,000, provided that Burbach seek recovery from Carolina alone; Burbach agreed to file a Satisfaction of Judgment upon the resolution of his claim against Carolina; and Continental lent $212,500 to Burbach, who agreed to repay the loan if he recovered money from Carolina. The United States District Court entered judgment on December 29, 1992.

In 1994, Burbach commenced a garnishment action in the Hennepin County District Court, seeking to recover from Carolina on his judgment against Armstrong. Burbach filed a Motion for Leave to File a Supplemental Complaint, seeking to add Carolina as a party to the action. On February 2, 1995, a preliminary hearing was held before then Judge Kathleen A. Blatz. On March 29, 1995, Judge Blatz found that there was probable cause to believe that Burbach had a cause of

---

[1] *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982).

action against Carolina. On April 12, 1996, Burbach and Carolina brought cross-motions for summary judgment at a hearing before Judge Cara Lee Neville. Without relying on Judge Blatz's probable cause determination, Judge Neville found as a matter of law that Armstrong was an insured under Carolina's policy. The judge then considered whether certain exclusions in Carolina's policy applied, and concluded that the exclusions in Part IV, Sections C1, C2, and C5 did not apply to the undisputed facts of the case. Judge Neville went on to conclude Carolina denied a tender of defense from Armstrong and that the *Miller-Shugart* settlement was valid and enforceable against Carolina. Accordingly, the court granted Burbach's Motion for summary judgment and denied Carolina's motion.

Carolina appealed Judge Neville's order. The Minnesota Court of Appeals considered whether the *Miller-Shugart* settlement was valid, but did not consider whether Carolina breached its duty to defend, whether Carolina was entitled to notification of the settlement negotiations, or whether Carolina had actual knowledge of the negotiations. *See Burbach v. Armstrong Rigging and Erecting, Inc.*, 560 N.W.2d 107, 109 (Minn.App. 1997). The Court of Appeals concluded that the settlement between Burbach and Armstrong was not a valid *Miller-Shugart* settlement, making it unenforceable. *See Burbach*, 560 N.W.2d at 109-110. The Court of Appeals went on to conclude that the amount of the settlement, which was almost twice the amount of Burbach's original demand, was inherently unreasonable. *Id.* at 111. On March 4, 1997, the Court of Appeals reversed Judge Neville's order and remanded the matter for further proceedings.

On November 5, 1997, Carolina moved for dismissal of the garnishment action. Burbach asked for a trial on his personal injury claim. Judge Neville observed that Burbach had not brought his personal injury claim in state court; he had brought a garnishment action. She also noted that Burbach had brought his personal injury claim in federal court and that judgment against Armstrong had been entered there. Being unable to vacate the judgment in federal court and recognizing that the garnishment action was founded on the invalid settlement agreement in the federal court action, Judge Neville concluded that the garnishment action could proceed no further. On January 23,

1998, Judge Neville granted Carolina's motion and dismissed the action. On October 27, 1998, the Court of Appeals affirmed Judge Neville's order. *See Burbach v. Armstrong Rigging and Erecting, Inc.*, Docket No. C0-98-843, 1998 WL 747905 (Minn.App. October 27, 1998).

While the dismissal of the garnishment action was on appeal, Burbach brought a personal injury action against Armstrong in Hennepin County District Court for the same injuries that were the subject of the lawsuit in United States District Court. On June 16, 1998, Carolina denied a tender of defense by Armstrong. On December 29, 1999, Armstrong moved to dismiss the personal injury claim. Judge Charles A. Porter observed that, in the earlier garnishment action, the Court of Appeals did not reverse Judge Neville's conclusion that Carolina owed a defense to Armstrong. He concluded that Armstrong needed to ensure that Carolina became a party to the matter. On January 14, 2000, Judge Porter denied Armstrong's motion to dismiss and ordered Carolina to pay Armstrong's attorneys' fees. Subsequently, Burbach and Armstrong agreed to binding arbitration. On May 30, 2000, Armstrong's attorney notified Carolina that the matter was set for arbitration on May 2, 2000; Armstrong formally requested that Carolina respond and defend it at the arbitration hearing. Carolina appeared at the hearing and asked that it be continued. When Carolina rejected the arbitrator's request that Carolina concede coverage, the arbitrator denied Carolina's request for a continuance and proceeded with the hearing. On June 14, 2000, the arbitrator awarded Burbach $1,000,000 in damages, but reduced that amount by 20% to reflect Burbach's share of the fault. Burbach and Armstrong stipulated to the confirmation of the award, which was subsequently confirmed by Hennepin County District Court Judge Deborah Hedlund on June 30, 2000.

On February 23, 2001, Burbach moved to file a supplemental complaint in garnishment against Carolina. Carolina moved for an order vacating Judge Porter's award of attorneys' fees. At the hearing, Burbach agreed to a denial of his garnishment motion on grounds that it was untimely made. On February 23, 2001, Judge Hedlund ordered that the matter be stayed for 90 days. Burbach was ordered to move to vacate the judgment entered in the United States District Court for the District of Minnesota on December 29, 1992, or his claim in state court would be

dismissed with prejudice. Burbach did not move to vacate the 1992 judgment.

On March 2, 2001, Carolina filed the instant action for declaratory judgment against Burbach, Armstrong, and Continental. On March 30, 2001, Burbach filed an answer and counterclaim for declaratory judgment. On April 2, 2001, Armstrong filed an answer with an unidentified cross-claim against Burbach for declaratory relief. On April 2, 2002, Continental filed an answer that contains a "counterclaim and crossclaim" against Burbach for declaratory relief.

On August 15, 2001, Judge Hedlund, observing that Burbach had not moved to vacate the December 29, 1992 judgment, dismissed the matter with prejudice. On appeal of that order, the Court of Appeals was unable to ascertain the basis for Judge Hedlund's order of February 23, 2001, and declared itself to be at a loss to comprehend it. In that regard, the Court of Appeals observed that the parties themselves could not agree on the meaning of the order for purposes of appeal. On July 1, 2002, finding itself unable to conduct a meaningful review of Judge Hedlund's August 15, 2001 order, the Court of Appeals reversed the order and remanded the matter for further development of the record. Specifically, the Court of Appeals ordered that the record clearly explain: 1) the basis for threatening, and subsequently ordering, dismissal unless Burbach brought a motion to vacate the federal court judgment; and 2) the District Court's intent in dismissing "this matter." *See Burbach v. Armstrong Rigging and Erecting, Inc.*, No. CX-01-1879 (Minn.App. July 1, 2002).

On February 19, 2002, Carolina filed a motion for summary judgment in the instant matter. On April 4, 2002, Continental filed a motion for summary judgment. On May 15, 2002, Burbach filed a motion for summary judgment. To date, Armstrong has not filed a motion for summary judgment. The motions were heard on July 29, 2002.

3. <u>Subject Matter Jurisdiction</u>

The parties seek declaratory relief pursuant to the federal Declaratory Judgment Act, codified at 28 U.S.C. § 2201. However, the Declaratory Judgment Act is a procedural statute, not a jurisdictional statute; consequently, federal jurisdiction is proper only if there is an independent

basis for subject matter jurisdiction. *See State of Mo. ex rel. Mo. Highway and Transp. Comm'n v. Cuffley*, 112 F.3d 1332 (8th Cir. 1997); *Larson v. U.S.*, 995 F. Supp. 969 (D. Minn.1997).

In its complaint, Carolina asserts that the Court has jurisdiction pursuant to the "diversity of citizenship" provision in 28 U.S.C. § 1332. The complaint alleges that all of the parties are citizens of different states. Furthermore, the record reflects that the amount in controversy exceeds $75,000. Accordingly, the Court concludes that it has jurisdiction over the subject matter.

4. Applicable Law

A United States District Court sitting in diversity jurisdiction applies the substantive law of the forum state, in this case, Minnesota. *See Martin v. Wal-Mart Stores, Inc.*, 183 F.3d 770, 772 (8th Cir. 1999) (*citing First Bank of Marietta v. Hogge*, 161 F.3d 506, 510 (8th Cir.1998)); *see also Am. Motorists Ins. Co. v. Samson*, 596 F.2d 804, 807 (8th Cir. 1979) (state law is applied in declaratory judgment actions brought pursuant to diversity jurisdiction).

5. Legal Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the case may be decided on purely legal grounds. Fed. R. Civ. P. 56(c); *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). To be considered material, any disputed facts must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In satisfying this burden, however, the non-moving party must do more than simply establish doubt as to material facts. The party opposing summary judgment may not "rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific

facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586, n.11; *see also Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995); Fed. R. Civ. P. 56(e).

6. *Miller-Shugart* Settlement

In their respective pleadings, Armstrong and Continental ask the Court to declare that Burbach is required to file a satisfaction of judgment pursuant to the settlement agreement of December 23, 1992.[2] The Minnesota Court of Appeals has already determined that the purported *Miller-Shugart* settlement in this case is unenforceable and unreasonable as a matter of law. Yet, three parties still seek to enforce it.

Pursuant to the holding of the Minnesota Court of Appeals, this Court will declare that Burbach is under no obligation to file a satisfaction of judgment with respect to the United States District Court judgment of December 29, 1992 in Court File No. 4-91-CV-593.

The Court's declaration disposes of all of the substantive claims raised by Armstrong and Continental in their respective answers.[3]

7. Carolina's Policy

Carolina denies that its policy covers Armstrong's liability. In doing so, Carolina does not

---

[2] Carolina also sought such relief in its complaint, but, as Burbach argues, Carolina does not have standing to seek the enforcement of the settlement agreement between Burbach, Armstrong, and Continental. To demonstrate standing, a plaintiff must show (1) it has suffered an injury in fact that is concrete and particularized and is actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Carolina has not shown an actual injury that is traceable to Burbach's failure to file a satisfaction of the judgment against Armstrong.

[3] While Carolina, Armstrong, and Continental requested other relief as may be "just" or "appropriate," the parties have not requested that the Court vacate the judgment entered in favor of Alfred Burbach and against Armstrong Rigging and Erecting, Inc. in the amount of $825,000.00 in Court File No. 4-91-CV-593. Similarly, Burbach, who was ordered to seek such relief, has not asked this Court to vacate the earlier judgment. As this Order entirely disposes of the parties' substantive claims for relief, such relief must be sought elsewhere.

deny that Armstrong is an insured with a legal obligation to pay damages. Secondly, it does not deny that the damages are the result of bodily injury caused by an accident. Thirdly, Carolina does not deny that the accident resulted from the ownership, maintenance or use of a covered truck. Carolina maintains that three policy exclusions preclude coverage in this case.[4]

Carolina's policy provides that it "will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which [the] insurance applies, caused by an accident and resulting from the ownership, maintenance, or use of a covered truck." The policy defines "insured" as "any person or organization qualifying as an insured in the WHO IS INSURED section," which, in turn, provides that, among others, "anyone else is an insured while using with your permission a covered truck that you own."

The definition of "insured" also contains a severability of interest clause which provides that, "except with respect to [Carolina's] limit of liability, the insurance afforded applies separately to each insured who is seeking coverage or against whom a claim is made or suit is brought."

The policy also contains thirteen exclusions; Carolina argues that three of the exclusions are relevant to its declaratory judgment action. The second exclusion provides that the policy does not apply to "any obligation for which an insured or his or her insurer may be held liable under any workers' compensation or disability benefits law or under any similar law." The fifth exclusion provides that the policy does not apply to "bodily injury to any employee of an insured arising out of and in the course of his or her employment by an insured." The thirteenth exclusion provides that the policy does not apply to "bodily injury to any insured or any member of the family of an insured residing in the same household as the insured."

[4]Relying on *United States v. Munsingwear, Inc.*, 178 F.2d 204 (8th Cir. 1949), Burbach argues that Carolina should be collaterally estopped from arguing that certain policy exclusions apply to this case because those matters were litigated in state court and Judge Neville ruled against Carolina. The Court rejects this argument. Where an appellate tribunal reverses a judgment, and remands the cause to the court below for further proceedings, there is no final judgment which will bar a subsequent action. *See City of Aurora v. West*, 74 U.S. 82, 92-93 (1868).

Armstrong claims that it is insured under the Carolina policy because it had permission to use Marquardt's trucks. Thus, Carolina is liable for any negligence on the part of Armstrong that caused an injury to Burbach. Carolina argues that, if Armstrong is an "insured" under the policy, the three above-quoted exclusions preclude coverage for Burbach's injuries.

8. Coverage

The first dispute between the parties involves whether the policy covers Armstrong. To resolve this dispute, the Court must interpret the policy's coverage and exclusion provisions. Interpretation of an insurance contract is a question of law. *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885 (Minn. 1978). The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract. *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn. 1998). A contract is construed as a whole with an attempt to harmonize all of its clauses. *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn.1990).

Carolina argues that the exclusions in the policy are broadly written to exclude coverage. Continental argues that the severability of interests provisions serves to limit the breadth of the exclusions, thereby providing coverage to Armstrong.

For example, the second exclusion in the policy excludes liability for "any obligation for which an insured or his or her insurer may be held liable under any workers' compensation...law." Continental argues that the "insured," Armstrong, could not be held liable for Burbach's injuries under any workers' compensation law. Accordingly, this exclusion does not apply. Carolina responds by pointing out that the exclusion refers to "an insured," as opposed to "the insured." By using an indefinite article instead of a definite article, the policy creates a broad exclusion. Under such a reading, coverage for Armstrong is excluded because Burbach's injuries create an "obligation for which an insured, [namely, Marquardt], ...may be held liable under...workers' compensation...law." Similarly, the fifth exclusion excludes coverage for "bodily injury to any employee of an insured arising out of and in the course of his or her employment by an insured."

Continental argues that this exclusion does not apply because Burbach's injuries did not arise out of and in the course of his employment with Armstrong. Carolina responds that the phrase "an insured" applies to Marquardt. Thus, because Burbach's injuries arose out of his employment with Marquardt, *an insured* party under the policy, coverage for Armstrong is excluded. Finally, the thirteenth exclusion excludes coverage for "bodily injury to any insured." Continental maintains that Armstrong is not seeking to recover for bodily injury and the exclusion is inapplicable. Carolina argues that coverage for Burbach's bodily injuries is excluded because Burbach is "an insured" for purposes of the thirteenth exclusion.

Continental maintains the Carolina's interpretation of these provisions conflicts with the severability of interests clause. As mentioned above, the policy's definition of "insured" provides that "except with respect to [Carolina's] limit of liability, the insurance afforded applies separately to each insured who is seeking coverage or against whom a claim is made or suit is brought." Continental argues that the exclusions in the policy should be applied separately to the insured seeking coverage, namely Armstrong. Thus, the exclusions must be read by substituting "Armstrong" for "an insured." Carolina responds that the restrictive substitution advocated by Continental would only be appropriate if the exclusions narrowly referred to "the insured."

There is some support for Carolina's position. Carolina's motion papers contain numerous citations to cases that have pondered the distinction between the definite article, "the," and the indefinite article, "an." *See, e.g., Watson v. United Servs. Auto. Ass'n*, 551 N.W.2d 500, 501 (Minn.App. 1996). Likewise, there is some support for Continental's position. The Minnesota Supreme Court has said that "severability demands that policy exclusions be construed only with reference to the particular insured seeking coverage." *Am. Nat. Fire Ins. Co. v. Estate of Fournelle*, 472 N.W.2d 292, 294 (Minn. 1991). Unlike this case, however, *Fournelle* did not involve the use of indefinite or definite articles in the exclusion. Continental also points to an Eighth Circuit Court of Appeals case that states that a severability of interest clause in a policy causes exclusions to apply separately to each insured. *See United Fire & Cas. v. Gravette*, 182 F.3d 649, 658 (8th Cir.

1999). However, *Gravette* involved the application of Missouri law and relied on *Baker v. DePew*, 860 S.W.2d 318, 320 (Mo. 1993). While the facts in *Baker* are extremely similar to those in the instant case, the insurance policy is not. The exclusions analyzed in *Baker* excluded coverage for "the insured," not "an insured," as in the instant case.

On its own, Carolina's analysis of the policy's use of an indefinite article in its exclusions is correct. However, Continental correctly suggests that the real issue is the way the exclusion is read in light of the severability of interest clause. Only one Minnesota case has explicitly addressed that issue. In an unpublished decision, the Minnesota Court of Appeals concluded that an exclusion referring to "an insured" was not negated by the use of a severability clause. *Slavens v. Am. Fire & Cas. Co.*, Docket No. C7-00-1070, 2001 WL 69463 (Minn.App. January 30, 2001). The Court declines to apply the holding in *Slavens* for four reasons. First, as an unpublished decision of the Court of Appeals, *Slavens* has no precedential value, but only persuasive value, at best. *See Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796 (Minn.App. 1993); *see also* Minn. Stat. § 480A.08. Secondly, *Slavens* is of little persuasive value. The Court of Appeal's ruling on the question of coverage provided no authority for its position. Thirdly, *Slavens* stated that there is no rule mandating that each and every word in an insurance policy must be given meaning. However, as mentioned above, a contract is construed as a whole with an attempt to harmonize all of its clauses. *Chergosky*, 463 N.W.2d at 525. It is not clear that *Slavens* attempted to harmonize the severability clause and the exclusions. Fourthly, *Slavens* ignores the Minnesota's Supreme Court decision in *Fournelle*. As discussed above, *Fournelle* describes the way severability clauses should be treated.

*Fournelle* stated that the intent of a severability clause is to provide each insured with separate coverage "as if each were separately insured with a distinct policy." *Fournelle*, 472 N.W.2d at 294. If each "insured" had a "distinct policy," it would be improper to read the exclusions broadly, as Carolina advocates. Thus, *Fournelle* implies that a severability clause eliminates any distinction between "an insured" and "the insured." Thus, if Armstrong is treated as having a distinct policy, then "an insured" can only refer to Armstrong. This conclusion is

consistent with the rulings of other courts that have relied on *Fournelle*. *See, e.g.*, *State Farm Fire & Cas. Ins. Co. v. Keegan*, 209 F.3d 767 (5th Cir. 2000). As in this case, the policy at issue in *Keegan* had a severability clause and contained specific exclusions for "an insured." The Fifth Circuit ultimately concluded that the conflict between the severability clause and the exclusion created an ambiguity and construed the policy against the insurance company. *Id.* at 771 (*citing West American Ins. Co. v. AV&S*, 145 F.3d 1224 (10th Cir. 1998)). The Court does not have to reach the question of ambiguity, however, because *Fournelle* suggests that the exclusions are limited by the severability clause. In failing to address *Fournelle's* analysis of severability clauses, the reasoning in *Slavens* is flawed.

Alternatively, the Court concludes that, absent the decision in *Fournelle*, the policy is ambiguous. The determination of whether a contract is ambiguous is a question of law. *Current Tech. Concepts, Inc. v. Irie Enter., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995) (*citing Lamb Plumbing & Heating Co. v. Kraus-Anderson*, 296 N.W.2d 859, 862 (Minn.1980)). In making that determination, a court must give the contract language its plain and ordinary meaning. *Current Tech. Concepts*, 530 N.W.2d at 543 (*citing Employers Mut. Liab. Ins. Co. v. Eagles Lodge*, 282 Minn. 477, 479, 165 N.W.2d 554, 556 (1969)). A contract is ambiguous if it is susceptible to more than one interpretation based on its language alone. *Metropolitan Sports Facilities Com'n v. General Mills, Inc.*, 470 N.W.2d 118, 123 (Minn. 1991). If a contract is ambiguous, it must be construed against its drafter. *Current Tech. Concepts*, 530 N.W.2d at 543 (*citing Lowry v. Kneeland*, 263 Minn. 537, 541, 117 N.W.2d 207, 210 (1962)).

As the Fifth Circuit concluded in *Keegan*, the Court concludes that the policy is susceptible to two interpretations. If the severability clause is applied to the exclusion, the exclusions must be considered solely with reference to the party seeking coverage. In such a case, Armstrong is covered by Carolina's policy. If the exclusion is considered an exception to the severability clause, the exclusions could be considered with respect to any of the insured parties. In such a case, Armstrong is not covered by Carolina's policy. Because the policy provides no indication as to the

preferred construction of the policy, the policy is ambiguous. Accordingly, it should be construed against Carolina so as to provide coverage to Armstrong.

9. Priority of Coverage

Continental has not disputed that its policies cover Armstrong. Having determined that Carolina's policy also covers Armstrong, the Court must determine the priority of coverage between Carolina and Continental. In determining priority, the Court first looks to the policies' "other insurance" clauses, and to any coverage acquired to satisfy motor-carrier regulations. *Mickman Bros. v. Farm Bureau Mut. Ins. Co.*, 639 N.W.2d 890 (Minn.App. 2002). However, the Court does not simply look at the policies' "other insurance" clauses; the Minnesota Supreme Court allocates coverage "in light of the total policy insuring intent, as determined by the primary risks upon which each policy's premiums were based and as determined by the primary function of each policy." *Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 712 (Minn. 1991) (*quoting Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82, 85-86 (Minn. 1988)). The Court also considers whether one policy is "closest to the risk." *Interstate Fire*, 433 N.W.2d at 85-86. Under a "closest-to-the-risk" analysis, the Court determines: (1) which policy specifically describes the accident-causing instrumentality; (2) which premium is reflective of the greater contemplated exposure; and (3) whether one policy contemplates the risk and use of the accident-causing instrumentality with greater specificity than the other policy. *Id.* at 86.

In this case, there are three policies at issue. Marquardt had a Truck Liability Policy with Carolina. The Truck Liability Policy provided coverage for truck liability, general liability, and physical damage. Armstrong had Commercial General Liability Policy and a Business Auto Policy with Continental. The Commercial Liability Policy provided coverage for Armstrong's business operations. The Business Auto Policy provided coverage for liability and physical damage.

All three policies contain "other insurance" clauses. Carolina's policy states that it provides primary insurance for any covered truck Marquardt owns and excess insurance for any covered truck not owned by Marquardt. Continental's Business Auto Policy provides similar coverage to

Armstrong. Continental's Commercial General Liability Policy provides that, in general, it is primary. However, the policy provides three exceptions to primary coverage. Of relevance to this case, the policy provides that it is excess "if the loss arises out of the...use of...'autos.'" Considering only the "other insurance" clauses of the policies, Carolina's coverage is primary.[5]

Carolina's policy also contains an MCS-90 endorsement. The endorsement complies with the coverage requirements in 49 C.F.R §§ 387.7 and 387.9. The endorsement also provides that it is primary. Citing *Mickman Brothers*, Continental argues that this endorsement makes Carolina's policy primary. The Court disagrees. *Mickman Brothers* stated "that insurance coverage a motor carrier acquires to satisfy the mandates of motor-carrier regulations is primary over non-mandatory coverage insuring an identical risk." *Mickman Bros.*, 639 N.W.2d at 896. The MCS-90 endorsement provides coverage for accidents involved in the transportation of non-hazardous property, various types of "hazardous substances," "hazardous waste," explosives, poison gas, compressed gas, and radioactive materials. However, the MCS-90 endorsement is for "public liability [and] does not apply to injury to or death of the insured's employees while engaged in the course of their employment." Because this is a case that does not involve "public liability" and does involve the injury of one of the insured employees in the course of his employment, the MCS-90 endorsement does not cover the identical risks involved here. Consequently, the holding in *Mickman Brothers* is not applicable.

When analyzing the total policy insuring intent, the Court considers the primary risks upon which each policy's premiums were based and as determined by the primary function of each policy.

---

[5]The parties have not suggested the possibility of concurrent liability, a position with some support in Minnesota law. *See Woodrich Const. Co., v. Indemnity Ins. Co. of N. Am.*, 252 Minn. 86, 101, 89 N.W.2d 412, 423 (Minn. 1958) (finding concurrent liability under automobile liability policy and comprehensive general liability policy where accident involving an automobile occurred on a construction site); *see also Waseca Mut. Ins. Co. v. Noska*, 331 N.W.2d 917 (Minn. 1983). If the Court were to apply *Woodrich*, a reading of the parties' "other insurance" clauses would lead to the conclusion that Carolina and Continental are concurrently liable for Burbach's injuries and each would be required to pay a *pro rata* share of any liability according to the limits of their respective policy's coverage.

*Garrick,* 469 N.W.2d at 712. Carolina's policy has a premium of $16,137.00. Of that amount, $14,706.00 was paid for Truck Physical Damage; coverage for Truck Physical Damage included bodily injury and property damage liability and uninsured and underinsured motorist coverage. The remaining $1,431.00 of the premium provided coverage for General Liability. Of this amount, $1,309.00 provided Comprehensive General Liability Coverage for Bodily Injury and Property Damage, $14.00 was for Premises Medical Payments Insurance, and $103.00 was for Personal Injury Liability Insurance for false arrest, libel, slander, wrongful entry or eviction, and invasion of right of private occupancy. The primary function of Carolina's policy is automotive insurance. The majority of the premium contemplates liability resulting from a car accident. Only a small percentage of the premium provided general liability coverage for the type of accident involved here.

Although no premium amount is specified in Continental's policy, Continental's Commercial General Liability Coverage more closely contemplates this type of accident. Continental's policy contains two premium classifications: "Machinery or Equipment–Industrial–installation servicing or repair" and "Rigging–not ship or boat, including products and/or completed operations." The policy goes on to define several terms that clarify the purpose of the insurance. The policy defines the phrase "loading and unloading" as the handling of property after it has been accepted for movement onto, in, or from a truck. A "Products-completed operations hazard" is defined as all "bodily injury" occurring away from premises you own or rent and arising out of Armstrong's "work." However, it does not include "bodily injury" arising out of the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it. Finally, Armstrong's "work" is defined as work or operations performed by Armstrong or on its behalf. Continental's policy appears to contemplate Burbach's "bodily injury" from a "Products-completed operations hazard," which resulted from Armstrong's "work," specifically, its "loading" of Marquardt's trailer. Whatever the exact amount of Continental's premium, its Commercial General Liability Policy considers the primary risks that caused Burbach's injuries and the Court concludes that the primary function of its policy was coverage for this type

of accident.

As with Carolina's policy, the primary function of Continental's Business Auto Policy is to provide coverage for automobile accidents. The Business Auto Policy provides coverage for bodily injury arising out of the use of a covered "auto." In contrast, Continental's Commercial General Liability Policy *excludes* coverage for bodily injury arising out of the use of an "auto." Because both of Continental's policies define "auto" to exclude a category of land vehicles known as "mobile equipment," the Court concludes that the coverage provided by these policies do not overlap with respect to the equipment used to load the trailer. Consequently, in looking at the total policy insuring intent, the Court concludes that Continental's Commercial General Liability Policy has priority over its Business Auto Policy. However, between the two automobile policies, Carolina's coverage is primary. The primary function of the policies is the same. As with Carolina's policy, part of the premium paid on Continental's policy covers liability insurance. Continental's policy specified that the liability insurance applied to "any auto." Thus, Armstrong's use of Marquardt's "auto" was covered by the liability component of Continental's Business Auto Policy. However, Carolina's policy specifies that it is primary for covered trucks. Because the only distinction between the two automobile policies is the "other insurance" clauses, discussed above, the Court concludes that Carolina's policy has priority over Continental's Business Auto Policy.

Finally, the Court considers whether one policy is "closest to the risk." *Interstate Fire*, 433 N.W.2d at 85-86. Under a "closest-to-the-risk" analysis, the Court determines: 1) which policy specifically described the accident-causing instrumentality; 2) which premium is reflective of the greater contemplated exposure; and 3) whether one policy contemplates the risk and use of the accident-causing instrumentality with greater specificity than the other policy. *Id.* at 86.

Under the first prong, the Court concludes that Continental's Commercial General Liability Policy more specifically describes the accident-causing "instrumentality." In this regard, the Court considers "the causal relationship between the injury and the accident-producing instrumentality, *not* the causal link between a party's potential negligence and the cause of the injuries." *Ed Kraemer*

*& Sons, Inc. v. Transit Cas. Co.*, 402 N.W.2d 216 (Minn.App. 1987). The closeness to the risk test is separate from any dispute among defendants as to whose actions negligently contributed to the accident. *Id.* Leaving aside the question of any contributory negligence on Burbach's part, the accident was caused by Armstrong's actions in loading Marquardt's trailer. Marquardt's trailer was not the accident-causing instrumentality; it was simply the place where Armstrong's loading took place. While Portec's freight was the object involved in the accident, it was not the accident-causing instrumentality. Rather, it was the loading Portec's cargo that caused the accident. Because Portec's cargo was loaded using Armstrong's equipment, the Court concludes that Armstrong's equipment was the accident-causing instrumentality.[6] Armstrong's equipment and the "loading" process in general are most specifically described in Continental's Commercial General Liability Policy.

The Court does not have enough information to analyze the second prong of the "closest-to-the-risk" test. As mentioned above, $1,309.00 of the premium in Carolina's policy provided Comprehensive General Liability Coverage for Bodily Injury and Property Damage. However, Continental's policies do not contain any information about the amounts of the premiums paid. Consequently, the Court cannot determine which premium is reflective of the greater contemplated exposure.

Under the third prong, the Court considers whether one policy contemplates the risk and use of the accident-causing instrumentality with greater specificity than the other policy. Because the Court has determined that Armstrong's equipment was the accident-causing instrumentality, it is clear that Continental's policy contemplates the risk with greater specificity.[7] Accordingly, the

---

[6]If the Court concluded that Portec's freight was the accident-causing instrumentality, the Court's conclusion would change slightly. In such a case, Portec's freight is *equally* considered by Carolina's policy, which covers motor carriers, and Continental's policy, which covers loading operations. However, in considering the other prongs of the "closest-to-the-risk" test, the Court would ultimately conclude, nonetheless, that Continental's policy is primary.

[7]This conclusion would not change if Portec's freight were the accident-causing instrumentality. As previously discussed, coverage under Carolina's policy is primarily directed toward automobile accidents. In contemplation of this type of risk, Carolina provides some

Court concludes that Continental's policy is closest to the risk.

For all of these reasons, the Court concludes that Continental's Commercial General Liability Policy provides primary coverage for Burbach's injuries, Carolina's Truck Liability Policy provides secondary coverage, and Continental's Business Auto Policy provides tertiary coverage.

10. Burbach's Final Claim

The foregoing memorandum effectively disposes of all substantive claims for relief—except one— brought by the parties in their respective pleadings. In his Answer and Counterclaim, Burbach asked the Court to order Carolina to pay and discharge "the judgment" in favor of Burbach against Armstrong. While Burbach's pleadings do not specify to which judgment he refers, his motion papers make it clear that he seeks to enforce the judgment in Hennepin County District Court. The Court is concerned about the ripeness of this issue. The question of ripeness touches a court's jurisdictional powers. *See Vogel v. Foth and Van Dyke Associates, Inc.*, 266 F.3d 838, 840 (8th Cir. 2001). A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. *Texas v. U.S.*, 523 U.S 296, 300 (1998). Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements. *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 580 (1985).

Burbach obtained a state court judgment against Armstrong. Burbach then sought to amend the complaint in that case to bring a garnishment action against Carolina. Judge Hedlund threatened to dismiss "this matter" if Burbach did not have his federal court judgment vacated. Judge Hedlund later dismissed "this matter." The Court of Appeals concluded that they could not "conduct any meaningful review" of Judge Hedlund's order because it could not determine to what the phrase, "this matter," referred. It is not clear whether Burbach has obtained a valid state court judgment against Armstrong; it is not clear whether Burbach will be permitted to bring a garnishment action

---

coverage for general liability. In contrast, Continental's Commercial General Liability Policy primarily contemplates the risks related to loading operations. As a result, risks related to Portec's cargo are more specifically contemplated by Continental's policy.

against Carolina in state court; it is not clear whether Burbach's claims against Carolina have been dismissed with prejudice. Whether Carolina is obliged to pay and discharge the state court judgment in favor of Burbach and against Armstrong Rigging rests upon contingent future events that may not occur as anticipated. Until Judge Hedlund develops the record on remand, an adjudication of these issues would be premature. Accordingly, the Court concludes that this issue is not ripe.

ACCORDINGLY, THE COURT FINDS THAT:

1. Carolina Casualty Insurance Company LACKS STANDING to seek a declaration that Alfred Burbach is obliged to file a satisfaction of judgment with respect to the United States District Court judgment of December 29, 1992 in Court File No. 4-91-CV-593; and
2. Whether Carolina Casualty Insurance Company is obliged to pay and discharge the state court judgment in favor of Burbach and against Armstrong Rigging is UNRIPE.

ACCORDINGLY, THE COURT HEREBY DECLARES THAT:

1. Alfred Burbach is under no obligation to file a satisfaction of judgment with respect to the United States District Court judgment of December 29, 1992 in Court File No. 4-91-CV-593;
2. Armstrong Rigging and Erecting, Inc. is entitled to defense and indemnification from Continental Insurance Company in connection with the personal injury claim of Alfred Burbach;
3. Armstrong Rigging and Erecting, Inc. is entitled to defense and indemnification from Carolina Casualty Insurance Company in connection with the personal injury claim of Alfred Burbach;
4. Continental Insurance Company's Commercial General Liability Policy provides primary coverage to Armstrong Rigging and Erecting, Inc. in connection with the

personal injury claim of Alfred Burbach;

5. Carolina Casualty Insurance Company's Truck Liability Policy provides secondary coverage to Armstrong Rigging and Erecting, Inc. in connection with the personal injury claim of Alfred Burbach; and

6. Continental's Business Auto Policy provides tertiary coverage to Armstrong Rigging and Erecting, Inc. in connection with the personal injury claim of Alfred Burbach.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Carolina Casualty Insurance Company's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART [Docket No. 21];

2. Continental Insurance Company's Motion for Summary Judgment is DENIED [Docket No. 29];

3. Alfred Burbach's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART [Docket No. 36].

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: Sept 13, 2002

JOAN E. LANCASTER
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*